## OVERSEERS OF THE TOWNSHIP OF TEWKSBURY *v.* OVERSEERS OF THE TOWNSHIP OF READINGTON.

1. Though a person purchases and pays for a piece of land and dwells thereon for more than one year, and afterwards receives a deed for the same, yet unless he reside thereon for the term of one full year after the delivery of such deed, he does not acquire a legal settlement in the township where such land lies.

2. A title to land which amounts only to a trust by mere *implication*, not arising by *deed*, nor established by any *previous decree* is not such *seizin of a freehold estate* as the act (*Rev. Laws* 35, *sec.* 1) requires.

This was a certiorari to the Quarter Sessions of the county of Hunterdon, to bring up to this Court the order of the Sessions, affirming an order of two justices to remove Baltus Pickle, Sen., a pauper, from the township of Readington, to the township of Tewksbury, in the county of Hunterdon.

The facts as they appeared by a state of the case agreed upon by the counsel of the parties, were as follows: The pauper, (Baltus Pickle, Sen.,) agreed with one Christopher Bocker for the purchase of a lot in Tewksbury at the price of fourteen dollars, for which he paid the money down, took possession in 1805, and resided on it till 1809, when he obtained a deed. From this time he continued to reside on the lot until the spring of 1810, when he sold and conveyed

it for $170, and removed out of the township. Christopher Bocker himself had no deed for the lot at the time he agreed to sell it to the pauper; he had only an article of agreement with Walter Rutherfurd for a greater tract, of which this was a small corner of less than an acre and a half, and the conditions which Bocker was to perform in order to obtain a deed, do not appear. The pauper dwelt on the lot five or six years *before* he got from Bocker a deed, and only five or six months *afterward.*

Under these circumstances the Sessions adjudged a settlement to the pauper in Tewksbury where the land lay. Against this order of the Sessions, the overseers of the township of Tewksbury sought to be relieved by prosecuting the present certiorari. And they contended by their counsel, *Mr. Wall,* that to sustain the order of the Sessions to remove the pauper to the township of Tewksbury, it was necessary that the counsel for the township of Readington should prove three things—1. Seizin in Baltus Pickle, Sen., (the pauper) in the township of Tewksbury. 2. That the pauper being so seized, dwelt on the same, or in the township of Tewksbury, for one full year after he became seized. 3. Not only that the seizin and the dwelling were for one year, but they were for the same year.

The words "*seized* of an estate of *freehold*" made use of in the statute meant a legal *seizin,* and there could be no legal seizin under a mere contract to purchase. The term seizin had a known, definite and legal meaning, and was exclusively applied to estates of freehold and inheritance. *Noy's Max.* 319; 1 *Co. Lit. sec.* 320, *page* 200, *b.*; 2 *Bl. Com.* 104, 144; 1 *Burr.* 107; *Rev. Laws* 151, *sec.* 9, 10, 11; 12 *John. Rep.* 73. That a *freehold estate* could only be created by deed, or by twenty years adverse possession. 2 *Picker. Rep.* 536; 14 *John. Rep.* 199; *Rev. Laws* 566, *sec.* 4; *Burr. Sett. cases,* 272, 540, 656; 1 *Halst. Rep.* 177. That Baltus Pickle never having been seized of an estate of

freehold until November, 1809, and having parted with it in January, 1810, gained no settlement in the township of Tewksbury.

*Saxton* and *Vroom*, contra, contended that the word *seized* used in the estate did not mean merely the legal title, but was the same as the word *possession.* 2 *Bl. Com.* 199, *Law Dic.* word *seizin;* 1 *Instit.* 153; 4 *Cru.* 102, *ch.* 6, *sec.* 10, *pl.* 10; 18 *Vin.* 185; 5 *Bin. Rep.* 260; 4 *John. Rep.* 462; 2 *Bl. Com.* 208; 1 *Term Rep.* 382, 402; 1 *Halst. Rep.* 222; 1 *Blac.* 364; *Salk. Rep.* 524.

That the word *estate* in settlement cases did not mean a legal title; an equitable title was sufficient. 3 *T. R.* 114, 771; *Doug. Rep.* 629; *Penn. Rep.* 1038.

That the justices were not to investigate the strict legal title because they were not considered competent. 3 *Burn. Just.* 495–6; 2 *Stra Rep.* 608; *T. R.* 554.

That wherever the qualification of estate was required an equitable title was sufficient. That the game laws made use of the word seizin, and that in the decisions upon those laws an equitable title was deemed sufficient.

The Chief Justice having been concerned in the cause, before he came upon the bench, gave no opinion.

The opinion of the Court was delivered by

Ford, J. Two justices made an order to remove Baltus Pickle, Sen., from the township of Readington to the township of Tewksbury, in the county of Hunterdon. The township of Tewksbury appealed to the Sessions where the order was affirmed. The case appeared to be as follows :

The pauper agreed with one Christopher Bocker for the purchase of a lot in Tewksbury, at the price of $14; for which he paid the money down; took possession in 1805, and resided on it till 1809, when he obtained a deed. From

this time he continued to reside on the lot till the spring of 1810, when he sold and conveyed it for $170, and removed out of the township. Christopher Bocker himself had no deed for the lot at the time he agreed to sell it to the pauper; he had only an article of agreement with Walter Rutherfurd for a greater tract, of which this was a small corner of less than an acre and a half, and the conditions which Bocker was to perform do not appear. The pauper dwelt on the lot five or six years *before* he got from Bocker a deed, and only five or six months *afterward.* Under these circumstances the Sessions adjudged a settlement to the pauper in Tewksbury where the land lay.

The statute provides, *Rev. Laws,* 35, *sec.* 1, that every person who shall become *seized* of any *freehold estate,* of the value of £50, in any township, and shall dwell upon the *said* estate, or in the township in which *such* estate doth lie, for one full year, shall thereby obtain a legal settlement in such township. The requirements of this section must all be fulfilled in order to gain a settlement.

The estate must amount to the value of £50, and without doubt this requisite was fulfilled; for although it cost the pauper less than that sum, it became so much more valuable by his improvements as to sell for $170.

The dwelling is required to be upon the *said* estate, meaning a freehold estate, for one full year; therefore dwelling ever so long on an estate *not* freehold does not fulfill the requirement; neither does dwelling on a freehold any less time than one full year fulfill it; they must both concur. If the pauper had no freehold before he got a deed, his time before cannot add itself to his time after to make up the year; nor can it enter at all into the computation. Otherwise, dwelling on *another person's freehold* for a year would give a settlement, provided a man should purchase the estate at the end of the year, and dwell upon it a day or a week before he sold it; in which case he would be a dweller on his own estate of freehold only a day or a week, instead

of the full year required by the statute. Therefore the main question presenting itself is this—was the pauper *seized of a freehold estate before he got a deed.*

Now it is too evident to be denied, that the *legal estate* remained in Rutherford or Bocker till the time of their conveyance, and therefore could not be vested in the pauper. But it is said, *first,* that the pauper had an *equitable* title from the time he paid for the land and took possession ; and, *secondly,* that an equitable title will give a good settlement under the act.

A court of law finds great difficulty in exercising equity powers for want of those facilities which the court of equity possesses for bringing before it all parties interested in the matter, and refusing to decree till they are heard. It is said that Bocker held this title under what a court of equity would denominate an *implied trust for the pauper ;* and on a bill for specific performance it would have decreed Bocker to give him a deed at any time after he had received the money for the land. But the pauper had nothing to shew for the sale of the lot but a *parol* contract which is void by the statute of frauds. If, however, the answer had admitted the contract, and such part of performance as relieved the case from this objection, it might have raised a more formidable difficulty, by answering, that Bocker himself had *no title* at the time of the contract, and part of his agreement was not to give a title till he got one from Mr. Rutherfurd ; in the meantime that the enjoyment of the land should go against the use of the money. Would the Chancellor have decreed Bocker to make the pauper a deed for Mr. Rutherfurd's land ? Mr. Rutherfurd must have been heard on this point. If Bocker had not fulfilled the conditions on which he was to have a deed from Rutherfurd, the estate must have been *left in* Rutherfurd, unless the pauper had fulfilled in Bocker's place in order to complete his equitable title ; but whether the pauper *would or would not* have paid Rutherfurd for the whole farm, in order to complete his

equitable title to this little corner of it, not amounting to an
acre and a half, might have been a serious question; yet
without such performance a court of equity might not have
decreed to him the legal estate. Therefore it is by no means
clear that the pauper had such an *equitable title* as would
have been established in a court of equity against Walter
Rutherfurd.

But *secondly.*—It is argued that an *equitable title* will
gain a settlement under the act. Now the *letter* of the act
certainly imports a *legal* estate; the words are, *seized of a
freehold estate.* The word *seized* will scarcely apply to an
eqitable title, which is merely a *right* to *have* a title, and
not the title itself. The word *estate* also stands clearly dis-
tinguishable from an *equity;* for *estate* and *equity* are not
synonimous words either in meaning or substance. And
how estates of freehold not arising from the operation of
law can be created by the act of parties *without deed* since
the statute of frauds, it is hard to conceive. Therefore the
*letter* of the act beyond all doubt imports to my mind a *legal
estate;* and if an equitable one be sufficient it must be so,
not according to the *letter,* but by putting on it a *construc-
tion* according to the supposed spirit and intent of the law.
Now some case or decision ought to be shown wherein such
equitable estate has been holden sufficient *by construction.*
But no case is produced, nor is it even surmised that such
an adjudication has ever been made. I am certainly not
aware of any myself. If a man marries a dowager he is
seized of a freehold estate in right of his wife. A mort-
gagor retains his legal estate against all persons but the
mortgagee, for a court of law considers a mortgage at this
day as only a security for the money and when it is satisfied
the mortgagor needs no reconveyance.

The English adjudications cited or referred to at the bar
have no reference to the construction of *our* statute or any
other statute. They stand on totally different principles.
Parker, C. J., and other judges after him, decided that a

man could not be removed from *his own* estate whether it was legal or equitable, and that to be *unremoveable* for 40 days gave a settlement in England. This introduced equitable titles into their settlement laws. It was not a construction on our statute nor even upon the English statute. It was a settlement unknown to both; and instead of being wisely done, it introduced so many fraudulent and inconvenient consequences that the legislative power afterward had to enact that it should be a good settlement only to the party himself so long as he held the estate, but no longer, and should afford no derivative settlement to his children. These decisions have therefore no bearing on the construction of our statute, nor do they afford us the least analogy.

Whenever the case of a cestui que trust shall present itself to the court, upon *express* trusts created in a *deed* or *settlement,* affording no uncertainty, where the trustees are a mere machinery for the express purpose of protecting him in possession and enjoyment, it will be time enough for the court to give an opinion upon it. But a trust by mere *implication,* not arising *by deed,* nor established by any *previous decree,* is not such *seizin of a freehold estate* as the act requires; and therefore in my opinion the order of justices and sessions in this case ought to be reversed and set aside.